Just before we start, our clerk has told me that you guys are going to divide time. Is it 6 and 4, or 6 and... For petitioners, it's 10 each, and for the government, I believe it's 6, 6, and 8. Or 6, 6, and for Dow, 8. Okay, well I'm just... 6 minutes is what you're going to take? 10, for the NRDC, and 10 for the NFFC. Okay, can we put 10 on? Hold on just a second. There we go. Good morning, and may it please the court. My name is Margaret Shia on behalf of Petitioner Natural Resources Defense Council. I'd like to reserve two minutes for rebuttal. Enlist Duo has now been on the market for nearly five years, and no court has ever reviewed whether it meets the basic safety standards set forth in the Federal Insecticide, Fungicide, and Rodenticide Act, or FIFRA. There was compelling evidence before EPA that Enlist Duo threatens the continued existence of the monarch butterfly, and may pose serious risks to human health. And FIFRA required EPA to consider this existing evidence before the agency, before it reached a registration decision. But the agency refused, and instead issued an expansive authorization for uses on three major crops across 34 states. EPA has offered a shifting array of excuses to defend its evasion of FIFRA's requirements, and now the agency seeks to impede this court's review. But the court should review, remand, and vacate the entire unlawful 2017 registration, which incorporates, reaffirms, and expands the earlier 2014 and 2015 registrations. Regardless of which FIFRA standard this court applies, unconditional or conditional, the Enlist Duo registration is not supported by substantial evidence, because EPA failed to consider the existing data about harm to monarchs and human health. When we cut through the convoluted history and explanations behind the registration, one thing is clear, and that's that EPA had and still has no real idea of whether Enlist Duo poses unacceptable risks, because it failed to consider the data of harms to monarchs and human health. NRDC and other commenters timely put this evidence before the agency, and requested that EPA consider it. In response, EPA never denied that this evidence is relevant to characterizing Enlist Duo's risks. And when did you put that in front of them? We put it in front of the agency at three different points, so before the 2014 registration, before the 2015 registration, and before the 2017 registration. And at each point, the agency refused to consider that data. So it was put before them before they came up to our court in 2016? Yes. That was in 2014, right? The agency first registered the initial uses in 2014, and then it amended it in 2015. For both of those times, there were public comment periods. And then there was a voluntary revamp when EPA reopened the record, and at that point it solicited comments on the entire decision again. So again, we put the comments before the agency. So before the agency reached the decision in 2017, it definitely had the opportunity to consider those comments. Can I ask this? I'm not going to have the terminology correct, but I thought the EPA did take into account the off-field effects on the butterflies, and it doesn't seem like you're challenging that. You're complaining about the agency's failure to take into account the infield? Is that what you call it? Yes, that's correct. So milkweed grows both in the fields and off the fields, and so we are concerned about the agency's failure to consider the impacts to monarchs based on the destruction of the milkweed in the field. And the agency concedes that and never looked at that. I guess that's what I don't understand. The whole point of this – boy, if I could kill that fly. We don't have a butterfly up there. It's a regular fly. The whole point of this product is to kill the weeds, and presumably the farmers are going to kill the weeds one way or the other, right? So why would the agency take into account the infield effect? Of course we're going to get rid of the milkweed in the fields. That's the whole point of this enterprise. Yes, the pesticide is intended to kill the milkweed, but I don't think EPA is suggesting that it's intended to kill the monarchs. And so EPA has to – so even though this is an intended use, FIFR requires EPA to consider all the unreasonable risks on the environment, which it doesn't define to include harms or risks that flow from the pesticide's intended uses. So there's no exception for – Well, no, I guess – tell me where I'm getting this wrong. Those weeds – the milkweed is going to be killed one way or the other, I guess is what I'm envisioning. That's the whole point of what the farmers want to do. So, yeah, there's not going to be any milkweed in the fields, but that's not being – that harm isn't being aggravated by the use of this substance versus some other substance, is it? But Enlist Duo is the cause of that harm. There can be different causes of that harm, and we could challenge those other causes of harm in other suits. But what's before this court is Enlist Duo, and Enlist Duo does destroy the milkweed on which the monarchs depend. And so that is an injury that's relevant here, and EPA had to look at that effect. But isn't – and following up on Judge Watford's question, that milkweed is already – we've got many other products that are already approved out there to use. If they're not going to use Enlist Duo, they're going to use Roundup or whatever, and that is going to take care of a large percentage of that milkweed. The other products would kill milkweed as well. But the thing is, milkweed, it grows back if it's not – it needs to be continually suppressed. And so we're talking about one product of several that will. But at minimum, you're talking about a marginal difference in what Enlist Duo would do as opposed to any other pesticide. Isn't that correct? You're not – it is to say you're not suggesting EPA needed to consider, well, what if all the milkweed were still in the fields? Because that's never going to be the status quo. You're just saying they needed to consider the marginal difference of milkweed that might be there if Enlist Duo was not being used. No, we're saying that the agency has to look at the amount of milkweed that Enlist Duo will destroy. So if – to the extent that Enlist Duo is being – is replacing other pesticides, so let's say other pesticide, Enlist Duo will now be used in 50% of fields as opposed to – and so we want to say, you know, from that destruction of the 50% of milkweed that's being caused by Enlist Duo, what are the impacts of that? So that's what we're saying that the agency had to consider. And EPA says it doesn't – it hasn't looked at that impact based on the infield destruction. So the FFRA doesn't allow EPA to ignore this evidence. And then at the end of the day, EPA has never looked at the destruction of infield milkweed based on – in connection with any previous pesticide registration. And the law doesn't allow EPA to ignore relevant evidence of the pesticides risks under either the unconditional or the conditional standard. Can I ask a more basic question? What – I don't know who asked EPA on remand to vacate the 2014 and 2015 orders. Were you one of the petitioners that asked them to do that? EPA asked to vacate, and so did the petitioners. I understand. We chose not to vacate the original order. We sent it back. Somebody filed a motion – maybe I have the terminology wrong, but effectively a motion to either reconsider or vacate before the EPA. Is that correct? We did file a cancellation petition. Okay, cancellation. Thank you. What's the status of that? Is your position that that is now mooted out and you can't go back to EPA and ask them to cancel that out in the EPA proceeding? It's not mooted out. It's a separate proceeding, so it is still pending before the agency. The agency just hasn't decided it. Are you the one I should ask a couple of questions about procedure, or is it one of these other two that are coming up? I'd be happy to try. The thing that worried me, and Judge Nelson has got me into it just a little bit, it seemed to me that the EPA issued an order registering Enlist Duo for six states on corn and soybeans, and it seems to me that the registration decision suggests that they received a conditional permit. And are you asking about 2017? That's in 2014. However, the notice of registration says that they received an unconditional registration. Can you tell me which one I believe and which one I don't? Because one is a conditional registration. I think that is pretty important because they're now here in front of us suggesting that they want another conditional registration, but based on the final registration of the first one. I think the agency just has not set forth an explanation. Its reasoning isn't clearly discernible from the documents. As you point out, the two documents contradict each other. So on the one hand, in the 2014 final registration decision, the agency says it's applying the conditional standard, which it can't do for Enlist Duo in the first instance. But then in the notice of registration, it says it's an unconditional registration. So clearly there's something unlawful going on here. Well, I'm not so sure about that. As I understand it, under C-5, the C-5 standard would only apply it to the first six states that were done in 2014. Everything else could be done under C-7. You just acknowledged that you have a separate motion to cancel that's pending in the 2014 and 2015 registrations. So that seems to me that those under your own admission are now still currently before the EPA, and we're dealing with a C-7 registration for new uses that have been added. No, Your Honor. There are three parts to the 2017 registration, and the first is one that reaffirms the 2014 and 2015 registration. Well, that's interesting, but reaffirms doesn't necessarily mean that they're reissuing it, and EPA doesn't seem to be arguing that. That's why I asked you whether you thought your cancellation petition was moot, and I was sort of surprised at the answer, because I would think that if you think the whole thing's up here, that that would moot the cancellation request before EPA, but you're saying there's still a separate proceeding going on. That's exactly what EPA and Dow are saying. No, Your Honor. I might be misunderstanding your question, but the cancellation petition is to cancel the existing registration, if it was still associated. Exactly. So there is an existing registration, and what is up before us now is an amendment that everyone agrees falls under C-7. No, Your Honor. At least at a minimum, the first decision within the registration must be subject to the unconditional registration. I agree with that, but that is what's currently pending before EPA. And it's also pending before this court. Well, I don't know about that. They've reaffirmed a decision that's currently pending before EPA. I give you it is an odd procedural position. There's no question about that. Maybe I could ask a little bit. It seems to me that I don't know what the first one was. It was all done under a conditional amendment. Then, having a conditional amendment in front of us, they asked for a remand. I get the idea from the notice that it might have been not conditional at all, but an unconditional. Then it goes back to the EPA because they wanted it remanded to the EPA. It seemed to me that the only thing remanded to the EPA was the unconditional or, excuse me, the amended or conditional amendment that they sought in 2014. Is that right? The thing that was remanded, it might be more helpful to think about in terms of the uses. The thing that was remanded was a registration for the uses on corn and soy in 15 states. First of all, it was six states. Right. But EPA amended that in 2015, and when it moved for the voluntary remand, I think it was for all 15 on corn and soy. Yeah, but just to be clear, it's important because those additional nine states would not fall under the C-5 standard. They'd fall under the C-7 standard. Isn't that correct? Well, they wouldn't have to fall under, but EPA chose to apply the C-5 standard to them, and so the agency should be held to the standard that it chose. Well, to me, if you're agreeing to that, that they applied the C-5 standard, then they've— Here's what confuses me about this case. I can't look at any brief. I've read 600 pages, and I can't look at any one of these briefs and come out in one section a coherent position. And I was actually shocked that you just acknowledged that it wasn't moot below because to me that just—you just conceded that EPA and the Dow are correct, that the original petitions are currently pending still before EPA. I don't see that you can have the two— I think I understand, and I apologize for the confusion. So there's no longer a freestanding 2014 and 2015 registration. Well, then what's your motion for cancel? That's why I asked you whether it was moot. I see. I'm sorry. I'm confused. But I guess what I mean is that we're only challenging the registration of the initial uses to the extent they've been incorporated into the 2017 petition. So if it's the case that the cancellation petition can only be tied to that prior freestanding registration, then it is moot. But to the extent that it can still be addressed to the continued registration of the initial uses, then it's something that's pending before the agency. But in any event, we're challenging only the 2017 registration, and the first decision is one that reaffirms the unconditional registration. And EPA said it reaffirmed it without any changes. But that's not what the agency actually did, because if it reaffirmed it without any changes, then that portion of the registration for the initial uses would still be unconditional. And I agree with you on that. And as I understand it, they took a voluntary remand. And I'm sorry, you're over, so I should ask other counsel. But I'll just ask this last one and then stop. But when they took the voluntary remand, EPA took the voluntary remand to look at the synergistic effects between the two ingredients, as I understand it. That is part of the 2017 order as it's come back up to us. So why doesn't that resolve the concerns about C-5 to the extent that there are any? Because that part of the decision still must be reviewed under C-5, and the court never addressed our claims that that part of the registration is deficient because EPA never considered the existing data about monarchs and human health. EPA can't use its voluntary vacater to avoid review of those issues. We raised those arguments as EPA explicitly represented to this court. We would be allowed to bring those same arguments, and there wouldn't be a time bar problem. But now EPA originally said it was too early to address our challenges, and now it's too late for the court to do so. But the agency can't have it both ways. The court must review all parts of the 2017 registration, and if the first part, which is subject to the unconditional standard, is unlawful, that means that the derivative expansion, the other two decisions, are unlawful as well. Okay. Thank you, counsel. We will hear from your colleague. Okay. Good morning, and may it please the court, Judge Watford, Judge Smith, Judge Nelson, George Kimbrough on behalf of petitioners. There will only be two of us, so they've got us outnumbered, so I'll have 10 minutes as well and try to reserve two minutes for rebuttal. And you're representing NRDC, is that correct? No, Your Honor. Got it. Thank you. In addition to FFRA, the other major statute at issue in this case is the endangered species, and that's where I'd like to spend my few moments. Specifically, Section 782, described repeatedly by this court as the heart of the ESA. While there are several steps in Section 7 consultation, what is at issue here is only the first and lowest threshold that may affect determination. If Enlist DOE may affect any endangered species or critical habitat, EPA must consult Fish and Wildlife Service. Now, this court, sitting en banc in the Karuk tribe case, defined the may affect standard as any possible. So I've read the Karuk case, and I find it very distinguishable. In that case, the action agency did not make any determination about may affect. They just ignored it altogether. That's different than the issue we have here where you have the action agency went through a pretty thorough process and made a no affect determination as to many, but then went in and consulted on some that they did make a may affect determination on. So I'm not entirely sure that Karuk helps you as much as . . . I know you're relying on the straight language there, but I think the case is distinguishable in my view. Judge Nelson, I think the case sets forth the standard first and foremost, setting aside the facts of the case, and it just repeats what this court has said previously for decades. Could you tell me how many species EPA consulted with the Fish and Wildlife Service on when they granted Roundup, when they approved it as a pesticide? So this has been going on for . . . the Pesticide and Endangered Species Act issue has been going on for quite some time. And so they did not do consultation on that. And in separate litigation on the registration of Roundup, they're going to . . . But I just think your position . . . I have not seen a case that supports your position that they have to consult with Fish and Wildlife Service on effectively . . . I mean, how many . . . you're saying 500-something species, aren't you? Well, that's what the agency said when it initially defined the action area. Five hundred and thirty-one were inside the action area. That's at ER 34. But after that, they cut the action area down to just the fields, and that's one of the two critical legal errors that they made in the case. First, applying the wrong MAFEC standard, and second, applying the wrong action area standard. And yet we've done that. We've allowed that in other cases. We just had a case in 2017 where we said the exact same . . . we allowed the same thing to happen. Judge Ikuda wrote that I think was cited in the brief. And that's what I'm confused on is when the agency . . . This is Friends of Santa Clara River case. And when the agency makes a no-effect determination, it seems to me you . . . they are given some discretion in how they do that. The question is were they arbitrary and capricious here. The question is whether they followed the procedures required by the Endangered Species Act. So, Section 706 of the APA says arbitrary and capricious and contrary to law. So, our position is that either way you look at it here, whether it's contrary to law, that is, they didn't follow the procedures the ESA requires, or arbitrary and capricious . . . The City of Santa Clara would suggest it's not contrary to law. The City of Santa Clara allowed EPA to make the . . . or excuse me, it was the Army Corps of Engineers in that case . . . allowed them to make these determinations, and that's what the statute requires. The statute requires the action agency to make initial no-effect determinations. And, that was done here. Sure. Judge Nelson, they have to make a no-effect determination. But, they didn't make a real no-effect determination. They made a some effect, but not to our level of concern decision. They tried to redefine this court standard for no effect to that. And, they cannot do that. Well, I'm not so sure about that. I mean they did go and do informal consultations with Fish and Wildlife Service, didn't they? Yeah, I was going to . . . I'm sorry I didn't get back around to your question on that. So, there were five species for which . . . for one of those species at ER 1000 . . . they informally consulted the Eskimo Curlew, a bird with Fish and Wildlife Service. And, Fish and Wildlife Service agreed with their assessment. But, here's the problem that I have with your argument. The suggestion that EPA . . . I mean they told them why they were going . . . the Fish and Wildlife Service . . . why they were coming with the informal consultation. It strikes me that if Fish and Wildlife Service had a problem with EPA's interpretation . . . they would have said, why in the world are you coming to us with one species? You should be coming to us with 500 species. Well, that's just it, Judge Nelson. They were cut out of this process, other than that one species. Well, but they never raised an issue. They have no role until the action agency here . . . which no expertise in these Endangered Species Act issues . . . comes to them and says, we need your help. That's okay. I mean, Congress clearly gave the action agency . . . They do, but they can't do it contrary to the ESA's mandates . . . and they can't do it contrary to this court's standard in Karuk Tribe . . . Washington Toxics . . . Western Watersheds . . . all the other cases that say that any possible effect . . . whether beneficial, benign, adverse or of any defined character . . . must require some consultation. But, if you're really true . . . if what you're saying is accurate . . . then you're asking EPA to consult on 500 species. And, Fish and Wildlife Service . . . it should have raised a red flag with them . . . that they got a request for one species. And, they should have said, what in the world? Where are the other 499? That didn't happen. And, that's why I have a problem with the argument that you're making . . . as I think you're putting in . . . I think you're stretching the statute beyond what it actually says. Well, there's nothing in the record for Fish and Wildlife's position. So, we don't know what it is. As to the . . . as Karuk Tribe said . . . informal consultation need not be an onerous burden on the agency. It's an exchange of emails with a biologist from Fish and Wildlife Service saying . . . Hey, here's our calculations on this. Do you agree with it or not? So, it certainly can be done. The point is, when you're dealing with endangered species . . . Congress put into that statute . . . institutionalized caution mandate. That's the underlying policy, as this court has said in the Cottonwood case . . . and, in other cases. And, what that means is . . . species get the benefit of the doubt . . . if there's uncertainty. So, when you have an action agency, like EPA . . . they have no special expertise. And so, when you have exposures of a toxic substance . . . for example, the whooping cranes. You know, we have 400 of those, right now, that are left. It says in the record, it's reasonable. They're going to be exposed to . . . enlist to a latent grain. Right, but exposure isn't the test. It's whether it may affect. And, they . . . I mean, the LOC that you're complaining about . . . they used an extremely low standard here. And, I guess . . . I guess that's the concern that I have is . . . I think you need to show that it's arbitrary and capricious . . . to use any standard, at all. And, I have a hard time with that, because that seems to gut the EPA . . . which clearly anticipate . . . the ESA . . . clearly anticipates that the action agency will make a no effect determination. And, that's how I think you distinguish Karuk and some of these other cases. Karuk Tribe says, first and foremost, if there's mitigation, as there is here . . . that will reduce, but not eliminate, off the field runoff here, of enlist duo. Just in that case, reduce and not eliminate was the wording they used. That cuts against, not in favor of having no duty to consult. Right? It should compel consultation, because it means all field impacts are possible. Remember here, the buffer that we're talking about is 30 feet downwind, one direction. So, if there's an endangered species, one inch or one-tenth of an inch off the field . . . in the other three directions, they're saying they have no duty to consult Fish and Wildlife Service . . . and that's not any possible effect. Now, that's not the standard. The action area definition, in fact, is any area directly or indirectly affected . . . and not merely the immediate area of the action. In other words, here, not merely the fields, which is what they cut it down to. And, for 501 species, they made no ESA assessment whatsoever. For the other 23 that they did species specific assessments for . . . the crane, the Indiana bat . . . Well, to back up, I don't think it's fair to say they made no assessments. They did make an assessment of whether they would be in the covered areas. You're right, Judge Nelson. I mean, they did no species specific assessment. They did a screening level assessment that showed that there may be risk. But, see this goes to my whole problem with your argument. You're basically trying to bring the Federal Government to a screeching halt. You're asking them to make a species specific determination . . . by the agency or in consultation with Fish and Wildlife Service . . . with 500 plus species, every time they want to do any action. And, I just don't think that's what Congress intended. What Congress intended was that endangered species get the highest level of priority. That's what this Court has said in Washington Toxics and in other cases. And, as I mentioned, in Karuk Tribe, the Court said this should not be . . . could not necessarily be an onerous burden on the agency. So, here, informal consultation . . . What the agency did here was try to make a not likely to adversely affect decision . . . and call it a no effect decision. But, even impacts that are discountable . . . require some level of consultation. And, this is very important on the level of concern issue. The agency itself defines that as an adverse harm level. If you look at ER 2529 and you look at ER 19 . . . they say, this is our screening level, level of concern, not level of effect . . . level of concern for potential adverse effects to endangered species. Now, that's not the right standard. They have to look for any possible effect. I'll reserve the rest of my time. Okay. Very good. Thank you. So, who's first? You are first. Just remind me how you all are dividing the time. Good morning, Your Honors. May it please the Court. I'm Michelle Walter with the Department of Justice . . . representing the Environmental Protection Agency. I'll be handling the FIFRA issues and I have six minutes. And, my colleague, Mr. Brett Grosko will handle the Endangered Species Act issues in six minutes. And then, the rest of our time, we'll go to Intervenors Council. Okay. Great. Now, I do want to start to unpack what is a complicated . . . and I agree, odd posture that this case is in . . . with respect to what is the proper scope of what can be challenged here . . . and what was done in the past and what was done in this current order. And then, in any time remaining, I would like to briefly address the monarch issue as well. So, if the Court could give me some indulgence to try to unpack this, I'd appreciate it. And, I think the best place to start is with FIFRA's Judicial Review Provision. And, that's in 16B. And, that review provision says that orders can be challenged within 60 days after their entry. So, when we're looking at what can be challenged here . . . it's the specific order that was issued in 2017. And, that order is found at . . . starting at ER 37. And, I don't mean to interrupt too much. Hopefully, I'll keep you on your flow. But, doesn't that just beg the . . . I agree with you. But, doesn't that just beg the question of what's encompassed by the 2017 order? They're arguing that that reaffirms. And, in reaffirming, you've brought everything back up. It does, but let me make a critical distinction for you, Judge Nelson. What NRDC is referring to, the language about reaffirming, is in what's called a Final Decision Document. And, I believe that's in the ER, starting at page 1 through 36. That Final Decision Document is not the order. That's simply EPA's rationale that puts in one cohesive place, all of its analysis and data underlying the registration decision. That is not what can be challenged. What's encompassed in the order that can be challenged was only an application for a new use of 2,4-D. And, that new use for 2,4-D was on an additional crop in all 34 states of cotton and on additional 19 states for corn and soybean. That is the full universe of what is encompassed in the action that EPA took in 2017. So, what about these other orders from 2014 and 2015? When will they come up? They have already come up, and they are legally and factually out of time to be challenged. Just a minute. When they came up the first time, and we got to the point where we granted the EPA's motion for remand, the EPA's brief at that point said, and this was in response to the petitioner's motion to adjudicate or stay the case, they said, you can't do that. It's not yet final. Let us go back. Let us do it again. The anticipated decision on remand will be a new final registration decision. And, to the extent the new registration decision relies on the EPA's earlier analysis of the issues raised in the original registration decision, those analyses would be subject to review in any challenge to the new final registration decision. That's what they said. Let me address that. So, therefore, what we did is we sent it all back to the EPA. We let it be remanded. We did not vacate it. Instead, we said the registration is without prejudice to the rights of either party to litigate that question before the agency. And everybody's been waiting for those 2014 and 2015 orders to be challenged. And you told them they didn't have to worry about it. There would be a day. Let me address that with two or three responses. First of all, the language that you're referring to is very specific. EPA referred to the decision. And, again, the decision is not the order. Now, what's important to understand is that EPA did not change anything with respect to the 2014 and 2015 orders. It reaffirmed everything, even after analyzing the synergy issue that prompted the remand. Legally, under the statute, once the court, A, didn't vacate those orders and, B, divested itself of jurisdiction, legally, the 60-day timeframe ran for those 2014 and 2015 orders to be challenged. Even though you said you'll have your right? The right that we're referring to is the ability to challenge any analysis that is incorporated into the 2017 rationale and decision. That analysis from 2014-2015 concerning risks and benefits and unreasonable adverse effects, all of that analysis is incorporated into the underlying decision for 2017. So can we look at that then? You're saying that's before us now. The analysis has been the same and consistent and updated where necessary throughout. And that analysis can be scrutinized. So the 2014 order is in front of us? No, not the 2014 order. Again, there can be no relief on those prior orders. The only relief the court could order here would be with respect to an additional cotton use and additional use in the other 19 states. That is the full universe of the court. So you're suggesting that what we did in 2016, because we didn't vacate, though it was exactly what your opposition suggested we ought to do, that we ought to vacate and that we ought to stay that decision and get rid of it because it was wrong, but because we allow this to go back on remand to you and let you think about it some more, given that it was a conditional registration, allow you to think about it some more, they never get a chance to fight that order? That's not correct. They, again, have filed the administrative petition. When did they get the chance? They have filed the administrative petition before the agency, which is still pending because EPA hasn't acted on that petition with respect to the 2014 and 2015 orders. And I do want to clarify one thing, Judge Smith. The 2014 and 2015 orders were not conditional. They were unconditional. Well, just a minute. I read the registration decision, and it says it's conditional. That's a clerical error, and we described that and explained that in our brief. The 2014 and 2015. So we're supposed to take that clerical error and just say it's of no essence? It's not relevant because, again, 2014 and 2015 are not before this court, only the 2014 order. Well, I understand what you're saying it's not before this court, but the bottom line is if I were in their shoes and I read what you said in any one of these situations, I'd be saying you're just trying to skirt the issue. We didn't skirt the issue. We specifically sought vacature, and, as I mentioned, we explained very specifically in the briefing that you referred to that the analysis, the decision, again, that decision document contains the analysis. That can be scrutinized and reviewed. Now, if I may, just in the brief time remaining, just give you some record sites with respect to the monarch issue, unless there's anything else I can clear up on the procedural issues. And supposing I don't agree with this? If you don't agree with this, it runs very contrary, again, to the clear language in the statute. Well, I understand what you're going to suggest. I just don't think that there's any statute which would suggest that's true. Supposing I don't, what should I do? The only thing you could do here, Your Honor, is order something specific with respect to the new use that's in the 2017 order, because the statute and EPA's regulations clearly define what an order is and when it can be challenged. That's the scope of what can be challenged here. So to find that a 2014 and 2015 can be challenged, despite the fact that the 60-day timeframe range would be contrary to the statute. What if we find that the 2014 and 2015 orders can be challenged and we uphold them in this proceeding? Again, I think, although the result might be favorable to us, again, I think going that route to even review those orders would be contrary to the statute. And I know you're out of time, but this is one question that I think is important to me. The data requirements that are discussed on ER30, this seems to be the question that's open, and I've got to be honest, I can't make heads or tails out of what you actually did here. So, well, first of all, let's, why, I've got a lot of questions, so I'm not going to, well, let me start with the first question, which is the reason you took the voluntary remand was to clear up the data gaps as regards to the synergy with the two ingredients. Is that correct? Correct, and let me just put nobody's challenging that analysis or conclusions with respect to synergy. Okay, and that's included here, right, in the 2017 order. That new data is here, isn't it, in ER23, if I'm not mistaken? And I'm sorry to be a stickler, but not included in the order, again, to be explained in EPA's rationale. But you're saying that, okay. But in ER30, let's just go to ER30 real quickly. You say, although there are currently no outstanding data required to support the registration of this action, the EPA has identified data that will be required in connection with registration review activities for 2.4.D. Help me understand. Is that something that would prohibit you from registering under C7 these additional uses, which you did here? Is this why you made this conditional, is because you're waiting for this new data to come in? Yes, and let me just give a little context to that. The entire reason why 2017 was conditional, but 2014 and 2015 were unconditional, is that in the intervening time between the 2015 amendment and the 2017 process, there is an ongoing registration review that is a completely separate process under FFRA. But that's my question, is are you suggesting here that that needs to be reviewed in that new process, or are you suggesting that this can't be, I think I got it. Go ahead, finish up. The reason this is conditional is because in that separate registration review, there is data about bee larva that pertains to all 2.4.D. products in general, but is not specific to the use of 2.4.D. here. So Congress did not intend in those situations where there's outstanding data for a registration to be held up or denied. That's why it can be conditional, and then, yes, once the registration process runs its course, then it can be reconsidered if that is going to have an impact. Thank you, that was helpful. May I provide? No, I'm good. Go ahead. I just wanted to provide the Court with a couple of citations with respect to the Monarch issue. First of all, there is no direct exposure to Monarchs on the field from 2.4.D. So Monarchs are not harmed by 2.4.D. itself. And the citation for that, one moment, is ER-64. And one of you made the point about the whole purpose of the pesticide is to control milkweed on the field, and that is what EPA takes into account when it looks at unreasonable adverse effects, because the very definition of that is looking at economic, social, environmental costs and benefits. So EPA looked at the fact that this pesticide is controlling milkweed and other weeds on the field, incorporated that into its unreasonable adverse effects analysis. If there aren't any other questions, then I would just ask on the FIFRA issues that you do deny the petitions. I would have one other question. Are you suggesting that NRDC has an appeal in the offing on the petition to cancel registrations, which would, if in effect, challenge the 2014 order and the 2015 orders? I missed the very first part of your question, that NRDC doesn't— As I understand it, the NRDC submitted you to the EPA an administrative petition to cancel registrations, which is what Judge Nelson has been quizzing about. My understanding from what you've told me, that they have a right to challenge the 2014 order and the 2015 order if, in fact, the EPA does not administratively cancel? Yes, so they could do two things. First of all, they could file a petition potentially for unreasonable delay if they want to try to make EPA, even though there's no time frame for acting on that administrative petition. Or secondly, once EPA does act on that, that's a final action that can be challenged. So that is another avenue of recourse that they would have administratively with the 2014 and 2015. They just don't have that avenue right now before this Court. So the only thing I have in front of me then, in your mind, is the final registration based, as I understand it, on final orders in 2014-2015 with this particular registration, which is conditional. That's not entirely accurate, Your Honor. Again, to be a stickler on the terminology. Well, I want to make sure. Yes, I appreciate that. There is only the 2017 order that's the only action on which relief can be granted, which has the very limited additional use for 240. That order superseded the 2014 and 2015. But to clarify in the terminology, there's only ever one registration for a product, which makes sense. You don't want two or three or multiple registrations for a product. You want one registration with one label and all of the conditions. There's one registration for Enlist Duo, but legally under the statute, the only action that can be challenged is the action EPA took on the new use for 240 in 2017. And it's conditionally in front of us? The registration was conditional, yes. Okay. Thank you very much. We'll hear from your colleague from DOJ. Good morning, Your Honors. I'm Brad Grosko from the Department of Justice. I'd like to address two points. I do want to get to the case law that was being discussed in that colloquy with Petitioner's Counsel. And second, with any time remaining, I'd like to address the fact that the petitioners have glossed over, which is that the Fish and Wildlife Service and the National Marine Fisheries Service in a 2014 interim report acknowledged that the levels of concern and risk quotient approach would be the one that would be used for Enlist Duo, and in fact stated on pages 20 and 22 of that document that it would be protective of non-target species, including listed species. That document is cited at page 96 of Heartbreath, and it's also cited in Petitioner's Reply. But to get to the case law, the best case is, as Your Honor, Judge Nelson mentioned, the Friends of the Santa Clara case because, to my knowledge, it's the only case cited where you're dealing with ambient exposure of a chemical to a species and in a no-effect context. In that case, the Corps of Engineers was looking at potential effects to steelhead. The Corps of Engineers was looking at potential discharges from a fairly large project and issuing a Clean Water Act permit. That permit triggered an Interspecies Act analysis, and they looked to see what potential effects there might be from those discharges that would reach the river. They determined that the amount in the discharge would be roughly 6.5 micrograms per liter. They noted that the background in the river was higher than that, about 9.9. They determined in that case it was analogous to the levels of concern that we're dealing with here in this case. The petitioners, and one of the petitioners here at the Center for Biological Diversity was one of the parties in that case, stated that there was a National Marine Fisheries Service guidance suggesting that at 1.8 micrograms per liter, that there would be sublethal effects to steelhead. This court granted the Corps of Engineers the latitude to look and see whether they should consult with the National Marine Fisheries Service. Did that necessarily mean there should be a consultation? Or conversely, if they had the expertise, and they should have that expertise deferred to, to look and see if that background level was so high that the 6.5 micrograms would not alter the overall concentration, and therefore would not harm steelhead. So that's really the best case for the court. Another case is the Flowers case. Neither of these cases have been grappled with by the petitioners in any meaningful way. The Flowers case was also the Corps of Engineers. The court was looking at two projects, again, under the Clean Water Act. One was some 400 acres, another was almost 600 acres development, and it was going to occur in Pygmy Owl Corridor for expansion. The Corps of Engineers contended that there were no Pygmy Owls that had been spotted, and therefore there would be no effect. The Fish and Wildlife Service had been requested at one stage to get involved, and had stated and objected there are saguaro cacti that could be used for Pygmy Owl nests. There are, this is a corridor that would be necessary for the species to be able to disperse and expand, and we think that this is necessarily, may affect. We should be involved. But again, this court deferred to the Corps of Engineers and recognized that institutional role that's there in the regulations to allow the Corps of Engineers to have the latitude to look at potential effects and say we don't find any of these owls are there. Can you help me out? This is helpful. Can you help me out with what happened here? There was informal consultation. What did those look like? Were they just emails? I'm still troubled by this idea that Fish and Wildlife, not troubled, but it's telling to me that Fish and Wildlife Service didn't come back and take this expansive view. I think the information you gave me tells me why they didn't do that, because they were expecting this, it sounds like. Your Honor, in a traditional case, to be perfectly candid, the Fish and Wildlife Service would not reach out and ask the action agency for more information. No, that's not what I'm suggesting. What I'm suggesting is when they saw a request to consult on just one species, it would strike me as odd if there was some suggestion that they were supposed to consult on 500 species. But you're saying even then they would never ask the question, they'd just answer it. I'm not saying it's never happened, but it's not necessarily the case that it would happen. The Fish and Wildlife Service would not necessarily be looking to take on 500 species. But in this case, you really do have a situation where the EPA faithfully implemented the statute. They put 700 pages plus out just on species and endangered species. And the operative documents from 2016 encompass 466 pages. And we're talking about, again, 530 species, 180-some critical habitats. If you look at, for example, Attachment K and Attachment M, these are hundreds of pages on individual species, documenting which documentation they looked at from the Fish and Wildlife Service. This was as thorough as it gets. They were extraordinarily meticulous in looking at what the potential effects were to these species. So, again, I would just reiterate that the Cray and Brink case is not relevant. The best one you should be looking at is the Friends of the Santa Clara River. Can you answer the question on how many species were consulted on when Roundup was registered? Now, Roundup is not, to be clear, Enlist Duo is separate from Roundup. I understand. I'm just trying to get a sense. I mean, if petitioners are correct, it would suggest to me that EPA has consulted in prior registrations on a far higher number of species. And if EPA consulted on 500 species when they approved Roundup, I think that would be not just positive, but it would be interesting to me. I'm not sure that there's been any briefing or discussion of a consultation on Roundup. But, no, the bottom line is here. This system works. Let me just try and set your mind at ease. But it could suggest whether they were arbitrary or capricious here if in another case they went in and actually consulted on 500 species. My suspicion is they didn't do that. And that's fine. We can go look it up. I've got law clerks who can figure this out. Just to one point, there were about four species for which the EPA looked and said, all right, our levels of concern are exceeded, even after the species level analysis. So what we're going to do is we're going to change the labels in 29 counties and ensure that there will be no overlap at all. So this process did work. So, Your Honor, just to conclude, we would ask that the Court uphold the Endangered Species Act findings in this case. Thank you. Thank you very much. Let's hear from counsel for the intervener. Good morning, Your Honors, and may it please the Court. Kathleen Sullivan from Quinn Emanuel representing the intervener Dow AgroSciences. As you can expect, since I represent Dow, I'd like to tell you a little bit about our product that informs the legal analysis here. As Your Honors have already observed, other forms of weed killer, glyphosate, the active ingredient in Roundup, and 2,4-D in its original form have been registered and in commercial use across the nation's farms for decades. What's new about Enlist Duo, and what is very important to the analysis here, is that Enlist Duo takes those old, long-registered, long-used ingredients, glyphosate and 2,4-D, and it combines it with choline salt and other ingredients to create heavier molecules that have the important effect that when Enlist Duo is sprayed on a field, it stays in the field. It has near-zero volatility. That means it's not prone to evaporating and then migrating off-site a couple of days after it's been laid down, and it has much, much lessened drift, or the capacity to drift away from the nozzle at the time of application. Now, this is very important to the legal analysis here, because what Enlist Duo does is, in contrast to old versions of glyphosate, old versions of 2,4-D, is it creates an environmentally favorable profile while being very effective in killing weeds and enabling us, frankly, to prevent some of the adverse environmental effects that go with old forms of weed killing. Remember, the original form of weed killing is plowing, tilling. That brought us the dust bowl. What we have today is forms of administration of weed killers that enable us to kill the weeds in the field, and, Judge Watford, I couldn't agree more that this entire review process, of course, took into account the fact that you'd be killing milkweed in the field while minimizing any off-field environmental effects. And, frankly, that made it very sensible for this court, back when it was considering whether to vacate or simply remand the 2014 and 2015 orders, it was very sensible to simply remand and not vacate, because if you vacate here, you're going to drive the farmers back into forms of glyphosate administration and 2,4-D administration, which create more migration, more drift, and are worse for off-field effects in the environment. So can I interrupt for two questions? Number one is I agree with you. I think what we did by not vacating, it was a wise thing to do. However, I think it would be fair to say that our colleagues who didn't vacate did not anticipate that it would come back in this particular posture. And I could understand an institutional concern here that if we start allowing these things to be vacated or remanded without being vacated, we are taking away some, I don't know how petitioners are ever going to get this up on the merits of C-5 for the original registration. Well, two things, Your Honor. First, I think we heard NRDC concede today that they don't think their original cancellation application is moot. So if they want to try to take it up through that, go back and try to take it up that way, to the extent that has any merit, they can do that. But they have basically conceded that 2014-2015 is not up through 2017. We agree strenuously with the EPA that all that is before you, as my colleague from Justice explained to Judge Smith, is the 2017 conditional amendment. Well, a problem comes, I guess, and that's why I would really like you to concentrate on the question my colleague asked. My problem is that it seems as if, from reading the literature, that what happened was we had a remand. We remanded at the EPA's request, if you will, and said if you're going to fight about whether the rights of the parties to litigate that question, you can do it in front of the agency. Then, after a time period, we all of a sudden put together something that the registration thought was a conditional amendment, comes through as thereafter unconditional amendment, and thus we can add this second unconditional amendment to it. Nobody's ever in this court had the opportunity to fight about that first 2014 or the 2015 order when, as I understood it from what happened, it was sent back to give the EPA the chance to rethink through it, but there would be a chance when these people would have the right to argue about it here. They want to argue about it now because the agency has made the decision that this is the same decision and it's all going to be the same, and they want to argue about that and you don't want them to. Well, Your Honor, two things. First, we think if you applied the C-5 standard here, it would be harmless error. I understand that. That's one argument. This record is good enough to pass C-5. In fact, you heard NRDC complain in their brief that, oh, in some places EPA said it was applying C-5. They can't do it. Well, frankly, if we pass C-5 by our own analysis, then we easily pass C-7 because C-5 is more restrictive. I agree with you, and I'm sort of wondering. It leads me to think that EPA might not have had as much confidence in the argument that's currently being made, and it's kind of a belt and suspenders approach to address C-5 legal standard in the analysis. I think that's fair enough, Your Honor. I think that the most important point here is that to the extent that the conditional amendment here incorporates some of the reasoning from the earlier registration, it amply shows that they were well-founded, they were supported by substantial evidence for FIFRA purposes, and they're not arbitrary and capricious for endangered species purposes. Your Honor, I have only a few minutes. Can I turn to endangered species because I want to add something a little bit to what my colleague said? This absolutely is not a case of arbitrary and capricious failure to consult under the ESA, not even close. And here's why. The Fish and Wildlife Services, my colleague from the other side said, oh, well, we haven't heard from Fish and Wildlife Services. If I could respectfully refer Your Honor to two places in which the Fish and Wildlife Service has spoken in favor of the EPA's approach to the endangered species analysis here, you need look no further than the Dow Brief, page 64, note 9, where we cite to the 2014 and 2016 guidance from the services that say exactly how you should go about, when you're registering a pesticide, looking at effects on endangered species. And they approve exactly what we did. Did they look at this specific approach EPA was using? The approach, but Your Honor, the place where they looked dead bang at this case is the Joint Report to Congress. And that's cited in the Dow Brief at pages 69 to 70. That's a 2014 joint report by the services. I thought that was EPA. That was the Fish and Wildlife Service? EPA plus the services, Your Honor. Oh. And in that, it's worth quoting, if you can indulge me a few seconds to read it. EPA scientists used highly conservative and protective assumptions to evaluate ecological risks for the new uses of 2,4-D and Enlist Duo. The assessments confirm that these uses meet safety standards for pesticide registration and, as approved, will be protective of non-target species, and here's the kicker, including endangered species. So you have the, in a joint report to Congress of which you can take judicial notice, you have the closest thing to the services approving the ESA analysis done by EPA in this very case. Last point, Your Honor, it would bring government to a screeching halt if you adopted the hair-trigger consultation requirement that the Farm Coalition has suggested to you here. Don't take it from me. Take it from the amicus briefs from the people who work in the field. I commend to you the crop life amicus brief in particular at pages 28 to 33, which tells you that there's 700 pesticide registrations a year. If you had to consult on 521 species for every one of those, it would bring government to a screeching halt, and it wouldn't protect endangered species because you'd never be able to get to the real cases of merit. And that leads me to apparently a very unfair question, but I'd love to know the answer, is how many species has EPA consulted on in these other registrations? Are you aware? I am not aware of the number, but I do not believe it is many. But the point here is that, as you said, Judge Nelson, the statute and the regulation commits to the actioned agency, not to the consulting agency, the determination of no effect. And I want to agree wholeheartedly that CORUCTRIBE does not disturb that assignment of responsibility. CORUCTRIBE is completely distinguishable on the ground that there the action agency failed to make a no effect determination. It talked about reduced and not no effects. Here, by contrast, the no effect determination was made. It was not arbitrary and capricious. It's supported by an ample record. And with respect, we think you should deny the petitions. Can I ask one more question? You've done a great job. But Enlist Duo, is it being used? There's some suggestion in the record that this hasn't gotten as much traction. And so I'd be interested in this idea of how much transfer has come over. Because we see some numbers that this is increasing. If we grant this, it will increase the use by 600%. And I'm trying to get a sense for how. That may be true, but that may be a very small quantity. So I'd just be interested in how Enlist Duo has actually done in the market. It's in use, and it's done well, and it is the future. But the important thing is it's acting as a substitute for old forms of glyphosate and 2,4-D use. Importantly, Your Honor, it's sold together with Enlist Crops. The way it works is you use Enlist Duo on Enlist Crops, which have been genetically engineered to resist glyphosate and 2,4-D. And so the seed stocks are out there in quantity. The Enlist Duo is out there in quantity. If you were to allow petitioners to upset the apple cart, it would be environmentally retrograde. It's a perverse and ironic thing that they want you to do something that would hurt the environment by taking away Enlist Duo and Enlist Crops, which involve herbicides that actually protect all the off-site possible species that could be affected and send us back to the old world. This is the future. It's in use. And it's not going to increase glyphosate, Your Honor, because it's not going to increase glyphosate over the current baseline. They give you this argument that somehow the standard should be increase over projected future diminished baseline. That's not the standard. Maybe I'm misremembering. There's so many facts going around now. But I thought they said it was the 2WD that was going to be increased by 600%. Yes, that's right, Your Honor. I just want to be clear. The failure to consider glyphosate in the 2017 conditional registration because it didn't involve a new use of glyphosate, that's correct, because as against the glyphosate baseline, there's no increase. And because of the 2WD increase, that's exactly what EPA did do. It looked at whether there would be a significant increase in unreasonable adverse environmental effects, the C7 standard, from an increase in 2WD. And on a very substantial record that my colleague has outlined, EPA properly found, based on substantial evidence, that there would not be adverse unreasonable off-field effects. And, of course, included in their determination, as Judge Watford suggested, was no unreasonable, remember FIFRA is a cost-benefit statute, no unreasonable adverse effect from doing what you do in the field, which is kill the milkweed so you can sell the world corn and soybeans. So, Your Honor, we respectfully agree with the government. You should deny the petitions. Thank you very much. Did both of you want rebuttal time? You can each have two minutes, I suppose. We let your opponents go way over. So, why don't you go first? So, first, I do not intend to concede that the 2014-15 registration is still pending before EPA. As I mentioned, we don't think there's a freestanding 2014-15 registration. We're just challenging the 2017 registration, including EPA's decision to reaffirm the registration of the initial uses. And we're entitled to challenge that decision. We're entitled to challenge the entire 2017 registration. Otherwise, to give a hypothetical, there could be a situation where EPA issues a completely unlawful registration for use of a pesticide in 49 states. It then takes a voluntary remand and then issues a new decision that reaffirms that and then expands it to one additional state. Then EPA can say, you can only challenge the one decision now. That makes no sense. And that would be a complete runaround around the judicial review process. The cancellation process is an entirely separate administrative process. There's no administrative exhaustion requirement in order for us to get into court. And we've only filed that cancellation petition in the hopes of getting the pesticide off the market during the remand period because we didn't know how long EPA was going to take before we could get back into court. The third point about the infield destruction of milkweed, again, EPA didn't look at the effects on monarchs. And to give an example of what we mean about why EPA has to look at the effect of Enlist Dual on milkweed, let's say there's four heart medications and a fifth one comes to the market. It turns out these are very dangerous. They could kill people. And so they're all market substitutes. So EPA is essentially saying if the fifth one could kill people, FDA doesn't have to look at it because if you took it off the shelves, the four others would still kill people. That's the opposite of how it should be. It should be the case that a petitioner could challenge each of the medications and that FDA has to look at the risks associated with each. Otherwise, we don't really get to the harm whenever there's a market substitute available. And the final point is that we didn't just raise issues about butterflies. We also raised serious concerns about human health, and EPA ignored that data as well. Thank you. Thank you very much. A few points, Your Honors. First, with regards to Ms. Sullivan's remarks, I would have a few points of rebuttal. First, there is no evidence Enlist Dual stays on the fields. You can look at ER-19 and ER-1043. 1043 is where EPA is saying the agency makes no claim that drift and runoff do not occur. They just say that it doesn't get out beyond their level of concern, and that's not the ESA standard. Having to do with impacts from 2,4-D and what is environmentally beneficial, as she acknowledged, we're talking about a 200% to 600% increase in 2,4-D in a way it's never been used before, over the top of these commodity crops. That is not just in spring and in fall, but during the summer season. So new times of exposure, and that's at ER-353. With regards to the history here and our colloquy, Judge Smith, their history here is of noncompliance. So with regards to pesticide consultation, it's all come through litigation. And I will point you to several current national biological opinions that are going on for major pesticides, cliforapose and mathathion. I'm probably mispronouncing those. But they are consulting on hundreds of species. You can find these. They're judicially noticeable in those cases. So this is what is happening with regards to these species. I want to talk about that 2014 document. It's very important, and we cite it at pages 19 and 23 in our brief, and it does three things. First, it's based on the National Academies of Science. This is best available science in the ESA. National Academies of Science at ER-1212 says risk quotients are scientifically indefensible. That's the system they used for assessing endangered species and pesticides. It says if there's overlap, that may affect. You have overlap, you consult. And it says the action area needs to have a footprint beyond just the fields. So it supports us in every way, that document. And it certainly doesn't support that what they did here is law. With regards to Karuk tribe, it is the standard for this court. There were two issues, and I brought it up here. The court says the second issue before us is whether the mining activities may affect a listed species. So that is a holding in that case where the court, the miners, maybe not EPA, but the miners vigorously disputed. The may affect threshold was met in that case, and the court said no. As a textual matter, you're saying this may disturb salmon habitat. We think that's enough, given the ordinary language of may disturb. But you don't disagree that in that case the action agency didn't make a determination at all. No, but it doesn't matter for purposes of what the standard is. And what they said was on this record, given those terms, it's ordinary meeting. That's enough. It's a low threshold, and it needs to be to ensure that these endangered species aren't injured. I know you're out of time, but one question I have, if you can address this, and I forget when it was made, but the Fish and Wildlife Service and EPA's joint statement to Congress, that does seem to be indicative that Fish and Wildlife Service is given a blessing here. I did, Your Honor. That's what I was talking about, our reply brief at 19 and 23. That's the 2014 document. It supports us in three major ways, and we cite that in our reply brief. So I will say just in closing, Your Honor, there is no case in this court or any other court that signs off on a no-effect determination of this magnitude, 185 million acres, 34 states, 500 endangered species, 600-fold increase in a novel new pesticide used in a new way. Okay? This is the first. Kuroop Tribe sets a standard. It's any possible effect. They're looking through the wrong lens at the impacts to the endangered species. They're looking for adverse effects, not any possible effect. They use the wrong legal standard. We ask you vacate the registration. Thank you very much. Our thanks to all counsel for your very helpful arguments in this complicated case. The case to stargate is submitted, and we are in recess for the day.
judges: N.R. Smith, Watford, R. Nelson